# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| CASEY LITZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 6:23-cv-03278-RK |
| | ) |
| NEW PRIME, INC., | ) |
| | ) |
| Defendant. | ) |

## ORDER

Before the Court is Defendant New Prime, Inc.'s motion for summary judgment. (Doc. 82.) The motion is fully briefed. (Docs. 83, 84, 85.) After careful consideration and review, the Court **ORDERS** that Defendant's motion for summary judgment is **GRANTED**.

### Background[1]

Defendant New Prime, Inc., is an interstate trucking company. It has three main terminals across the United States: Springfield, Missouri; Salt Lake City, Utah; and Pittston, Pennsylvania. These three terminals house five Operations Managers—Springfield (3), Salt Lake City (1), and Pittston (1). The Operations Managers oversee and supervise Fleet Managers. The Fleet Managers are responsible for employment decisions and oversee and supervise New Prime's drivers and New Prime's driver training program.

New Prime's driver training program trains driver trainees. Driver trainers are responsible for the operational training of driver trainees. To become a driver trainer, a driver notifies their Fleet Manager, who determines whether they meet the qualifications to become a driver trainer, which includes, *inter alia*, consideration of the driver's professional driving experience, whether they have had any reported accidents or log violations, as well as the driver's net fuel cost. (Doc. 84-3 at 2.) Driver trainers communicate to the Fleet Manager their input regarding a driver trainee's progression and any deficiencies in training, and whether the trainee can/should be advanced through the training process. The Fleet Managers, however, are ultimately responsible for supervising the training program, including when and how driver trainees are advanced through

---

[1] The Court omits facts about which there is a genuine issue as well as facts that are immaterial, not properly supported, or are legal argument and conclusions improperly asserted as facts.

the program and whether a driver trainee passes or fails the training program. In addition, the Fleet Manager must be involved in a driver trainer's decision to remove a driver trainee from a truck.[2] Otherwise, the driver trainers act as manager and supervisor when in the truck with the trainee during driver training.

Plaintiff Casey Litz, who is female, began driver training for New Prime at the Pittston Terminal in October 2021. On October 29, 2021, in orientation, Plaintiff learned of New Prime's anti-sexual harassment and nondiscrimination policies and received training regarding those policies. All New Prime drivers receive the same training concerning New Prime's anti-sexual harassment and nondiscrimination policies during orientation. Also, during new driver orientations, New Prime's Driver Liaison, Brooke Mosley, presents New Prime's female driver program, "Highway Diamonds." Mosley provides her email and personal cell phone number to drivers as an additional point of contact to report any concerns or complaints.

Edwin Reyes, who is male, was a driver trainer at the Pittston Terminal when Plaintiff began her training there. Reyes had similarly received anti-sexual harassment training during his original orientation as a new driver, as well as additional anti-sexual harassment training during his training to become a driver trainer.

On October 29, Plaintiff was assigned to the training pad to practice, learn, and pass a pre-trip vehicle inspection. Plaintiff requested a female trainer for eventual "over the road" training (i.e., training that involved traveling across the country instead of shorter local routes or day trips). While training on the pad and on local routes, Plaintiff was assigned a daytime trainer: Reyes. On the second and third days of training, Plaintiff and Reyes drove the truck on a short five-mile day trip and practiced driving and backing the truck on the training pad. Reyes did not say or do anything inappropriate toward Plaintiff during this time.

Four days later, in the early morning hours of November 3, 2021, Reyes picked up Plaintiff from a hotel room that New Prime had provided Plaintiff and drove her to the Pittston Terminal to pick up a truck and trailer for a local day trip to a Sam's Club in Springfield, Massachusetts.[3] After

---

[2] The summary judgment record is not clear under what circumstances a driver trainee would be removed from a truck.

[3] In her deposition Plaintiff testified that Reyes told her to do the day trip as part of her training program. Nothing in the record indicates that this day trip was not properly part of the new driver training program. Plaintiff testified in response to counsel's questioning that she was not aware that she "could have completed all of [her] training on the training pad" and that she thought the local day trip was part of the

2

picking up the truck and trailer at the Pittston Terminal, Reyes and Plaintiff drove to the Massachusetts Sam's Club; Reyes drove the first hour-and-a-half to two hours, and Plaintiff drove the rest of the way.[4]

During the drive, Plaintiff claims that Reyes talked about past relationships and told her that he was not sexually attracted to his wife and was unhappy with his sex life because "she would only let him do missionary style." Plaintiff testified at her deposition that the conversation was "surprising" because it had occurred unsolicited and just after Reyes began talking about his family. Plaintiff also claims that Reyes had an inappropriate "flirtatious" video call with a woman whom he called his "work wife," and who Plaintiff believed to be a previous trainee of Reyes'.

After arriving at the Massachusetts Sam's Club, Plaintiff backed the truck into the dock and went with Reyes into receiving to complete the paperwork. Plaintiff and Reyes then picked up an empty trailer and parked at a neighboring Walmart to get lunch at Subway before heading back to the Pittston Terminal. Plaintiff testified that Reyes paid for her meal despite her asking him not to. When they returned to the truck to eat, Plaintiff claims that Reyes suggested they rest because they had "some time to kill" before returning to the Pittston Terminal.

When Plaintiff leaned her passenger seat chair back to rest, Reyes told her that she could rest in the bottom bunk in the cab and that he would take the top bunk. Plaintiff laid on top of the covers on the bottom bunk with her clothes on; Reyes closed the curtains and sat in a camping chair between the front of the truck and the bunks to watch a movie. After watching the movie for a bit, Plaintiff turned on her right side to rest so that she was facing the back cabin wall, with her leg laying partially on her phone. Reyes then put the chair away and climbed into the top bunk. After a few minutes, however, Reyes got down and pulled her phone out from underneath her leg,

---

training. (Doc. 84-7 at 5-6, p. 29:23-25, 30:1-6.) Later, Plaintiff argues, citing this testimony, that "Prime failed to inform Plaintiff . . . that [she] could have completed [her] training entirely on the pad." (Doc. 84 at 47.) Plaintiff points to no evidence in the summary judgment record, however, beyond the implied proposition behind counsel's question to Plaintiff itself that this specific local day trip (or any local day trip in general) was somehow itself improper or outside the bounds of the new driver training program. Counsel's question to Plaintiff and the proposition behind it is not evidence. Plaintiff points to no evidence in the summary judgment record that new driver training could be completed solely on the training pad without any local day trips or that this day trip with Reyes was improper. The Court therefore rejects and does not consider Plaintiff's suggestion that the day trip itself was somehow improper or unnecessary.

[4] The Court takes judicial notice that the distance between Pittston, PA, and Springfield, MA, is approximately 230 miles. *See Ryno v. City of Waynesville*, 58 F.4th 995, 1001 & 1001 n.2 (taking judicial notice of distance).

said, "you're laying on your phone," and proceeded to climb into the bottom bunk with Plaintiff. Plaintiff claims that Reyes started to "spoon[]" her and "pushed his whole body against [her] and wrapped his arm around [her]" so that she was between the cabin wall and Reyes' body. Plaintiff claims that she could feel his genitals on her backside.

Plaintiff, in shock, quickly sat up and told Reyes to get off her. Reyes raised up and said, "Oh, I thought you were cold." Plaintiff sat in the passenger seat of the truck while Reyes sat in the driver's seat. She told him, "What are you doing? I can't believe you just did that to me . . . If I was a male student, this would have never happened." Reyes apologized multiple times and when Plaintiff exited the truck, he came around asking to "talk" and stated that he needed to get her safely back to the Pittston Terminal. Plaintiff responded that she would find her own way home.

As Plaintiff started walking toward the Walmart store, Reyes followed. She told him to get away from her and to leave her alone. Plaintiff agrees that Reyes never physically restrained her or tried to take her back to the truck, although he did continue to follow her across the Walmart parking lot. While walking towards the Walmart store, Plaintiff called Stan Kasterke, New Prime's Driver Training Program Manager, and told him what had happened. Kasterke told Plaintiff to get to a safe location. Kasterke then called Reyes and told him to go back to the truck and to leave Plaintiff alone. Kasterke called Plaintiff back to make sure that she was in a safe environment. Mosley contacted New Prime's Director of Corporate Security, William Boehning, who also called Plaintiff to ensure that she was safe and secure. Boehning testified that Plaintiff told him that she was in a Subway food store and that Reyes was not there; Boehning told Plaintiff to call 911 if she needed additional assistance, which Plaintiff did. Plaintiff was also contacted by the dispatcher or Fleet Manager, Theresa Glevick, to check on her. Plaintiff recorded a video of herself in Subway stating what had happened with Reyes in the truck.

That same day, New Prime provided Plaintiff a hotel room for the evening and offered her a bus ticket or to travel back to the Pittston Terminal with another female driver. The next morning, Plaintiff called New Prime and expressed concerns about these options, so they provided her with a rental car. While at the hotel, Plaintiff also requested that New Prime reimburse her expenses and terminate her training contract—meaning that she would not owe New Prime any money under the training contract. New Prime agreed to do both. On November 4, 2021, Plaintiff drove a rental

4

car—paid for and provided by New Prime—to the Pittston Terminal and then to her home. New Prime reimbursed Plaintiff for expenses incurred while traveling home.

Boehning took the initial report from Plaintiff regarding the incident, which was documented in writing. Plaintiff told Boehning that Reyes told her she was laying on her phone and had then laid next to her, wrapped his arm around her, and said that she appeared to be cold, at which time Plaintiff had exited the truck. She did not tell Boehning that Reyes had pressed his private parts against her.

As Driver Liaison, Mosley is responsible for investigating harassment complaints involving drivers. On November 9, 2021, Mosley interviewed Reyes. The Operations Manager for the Pittston Terminal, Jason Seymour, along with Kasterske and Boehning were present and participated in the interview. Reyes denied that he had laid on Plaintiff's bunk and claimed that he had just taken her phone from the edge of the bunk and placed it between Plaintiff and the back wall because he did not want it to drop as they were getting ready to leave.

As part of the investigation, Mosley also spoke with the most recent six female trainees that Reyes had trained. Four expressed no concerns. One trainee, Tyesiah Harris, stated that Reyes was a great trainer although there had been another female trainee that she felt was getting more of Reyes' attention and that maybe they were friends. She told Mosley that she would not recommend Reyes to train females "due to the frustration she experienced and the stress of training" that she described as "very intense and demanding." Harris told Mosley that she wished Reyes was more patient but also that she was not uncomfortable with Reyes in a sexual harassment kind of way. Another trainee, Molly Mushlit, told Mosley that during the summer of 2021, Reyes would try to separate her from the group and offer to buy her things. Mushlit also reported that Reyes had once tried to get her to stay in his hotel room and did other things that made her uncomfortable. Mushlit told Mosely that Reyes would undermine Mushlit's relationship with her boyfriend and ask for hugs.

Based on Plaintiff's complaint and the subsequent investigation, Reyes was terminated. On November 10, 2021, Mosley sent an email to Seymour, Kasterke, Boehning and Glevick indicating that Reyes had been terminated. Also on November 10, Plaintiff gave a written statement to New Prime through counsel. On November 15, 2021, Plaintiff communicated again with Mosley, who advised her that she (Plaintiff) would not be charged for her Comdata account. Plaintiff's last communication with Mosley occurred on December 13, 2021, when she asked

5

Mosley whether she (Plaintiff) was still listed as employed by New Prime because she was applying somewhere else. Mosley confirmed that Plaintiff's training contract was voided to ensure that it did not impact her decision whether to continue training with New Prime. Plaintiff did not communicate with Mosley after December 13, 2021. Plaintiff testified at her deposition that New Prime did not tell her that Reyes had been terminated. It is undisputed that New Prime never refused to continue Plaintiff's training but that Plaintiff herself decided not to continue training with New Prime. Plaintiff testified that she had made the decision not to continue training with New Prime right after the incident had occurred with Reyes. It is similarly undisputed that Plaintiff was not disciplined or reprimanded by New Prime in any way or manner for complaining about Reyes.

Further facts are set forth as necessary.

## Legal Standard

Federal Rule of Civil Procedure 56 governs a motion for summary judgment. "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. Fed. R. Civ. P. 56(a). "Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). In this context, a fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the necessary inquiry is whether "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"A moving party is 'entitled to judgment as a matter of law' if the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof." *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant must "support" its motion either by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1), or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp.*, 477 U.S. at 325. "Once the movant fulfills its responsibility of informing the court of the basis for its motion, identifying the portions of the

record that demonstrate the absence of a genuine issue of material fact, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 857 (8th Cir. 2018) (citation and quotation marks omitted). An "adverse party may not rely merely on allegations or denials, but must set out specific facts—by affidavits or other evidence—showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)).

"In considering a motion for summary judgment, the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co.*, 893 F.3d at 1102 (citation and quotation marks omitted).

## Discussion

In the Third Amended Complaint, Plaintiff asserts four claims of employment discrimination under both federal (Title VII of the Civil Rights Act of 1964) and state law (the Missouri Human Rights Act): two claims for gender (sex) discrimination and two claims sexual harassment/hostile work environment. New Prime seeks summary judgment on all counts. The parties agree that the same legal analysis applies to both the state law and federal law discrimination claims. The Court proceeds accordingly. *See Johnson v. Westinghouse Air Brake Techs. Corp.*, 104 F.4th 674, (8th Cir. 2024) (applying same framework to Title VII and MHRA claim); *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1107 (8th Cir. 2016) (same); *Duncan v. Gen'l Motors Corp.*, 300 F.3d 928, 930 n.2 (8th Cir. 2002).

### I. Gender (Sex) Discrimination (Counts 1 and 3)

In Counts 1 and 3, Plaintiff asserts a claim against New Prime for gender (sex) discrimination under both federal and state law. To establish a claim for gender (sex) discrimination, Plaintiff must prove: (1) she is a member of a protected class, (2) she was qualified for her job, (3) she suffered an adverse employment action, and (4) there are facts that give rise to an inference of unlawful gender discrimination. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014).

New Prime argues that it is entitled to summary judgment because (1) Plaintiff failed to plead any adverse action (and specifically, Plaintiff did not plead constructive discharge in her

Third Amended Complaint), and (2) there are no facts that give rise to any inference of gender discrimination, i.e., Plaintiff has presented no evidence that any male employee was treated better or more favorably than Plaintiff (a female). In her summary judgment response, Plaintiff asserts two adverse actions that are applicable in this case which support her claim for gender (sex) discrimination. Specifically, Plaintiff asserts (1) that she "was taken off Mr. Reyes' truck and missed out of the benefit of training during the back half of the day trip, necessarily interrupting her training," and (2) that she was constructively discharged.

Title VII makes it unlawful for an employer "to discriminate against any individual" on the basis of their sex. 42 U.S.C. § 2000e-2(a)(1); *see also* Mo. Rev. Stat. § 213.055(1)(a) (prohibiting an employer from discriminating against an employee "because of" the employee's sex under state law). A key element of any discrimination claim against an employer under both federal and state law is that the employer took an adverse employment action against the employee. To be actionable, such adverse employment action must have "brought about some disadvantageous change in an employment term or condition." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024). Indeed, the core of any discrimination claim against an employer is the link or connection a plaintiff makes between the employer's sufficiently detrimental adverse employment action and the employer's discriminatory animus, intent, or machination.

Plaintiff first argues that the interruption of her training to the extent that she was "removed" from Reyes' truck after he sexually harassed her and did not complete the return trip to the Pittston Terminal is an actionable adverse action sufficient to support a claim for gender (sex) discrimination. The Court is not persuaded. Neither New Prime nor Reyes removed Plaintiff from the truck. Instead, as best as the Court can discern, Plaintiff appears to argue that the fact of Reyes' sexual harassment of Plaintiff is itself an adverse employment action sufficient to support a claim for gender (sex) discrimination. Reyes' sexual harassment of Plaintiff is not itself an adverse employment action to assert a claim for gender (sex) discrimination, however.

On this point, the Court is careful to distinguish between a claim for gender (sex) discrimination and a separate claim for sexual harassment/hostile work environment, the latter of which Plaintiff asserts against New Prime in Counts 2 and 4 of the operative complaint. A separate claim of sexual harassment/hostile work environment recognizes that an employer may be held liable under state and federal discrimination law based upon an instance (or instances) of sexual harassment that occur in the workplace. *See, e.g.*, *Mahler v. First Dakota Title Ltd. P'ship*, 931

F.3d 799, 806 (8th Cir. 2019) (recognizing a hostile work environment claim as actionable so long as plaintiff shows "[sexual] harassment was severe enough to affect the terms, conditions, or privileges of her employment") (citation and quotation marks omitted); *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 666 (Mo. banc 2009) (recognizing that "[s]exual harassment creates a hostile work environment when sexual conduct either creates an intimidating, hostile or offensive work environment or has the purpose or effect of unreasonably interfering with an individual's work performance") (citation omitted). For purposes of Counts 1 and 3, however, Plaintiff cites to no caselaw or legal authority—and the Court is not aware of any—that the fact of an occurrence or instance of sexual harassing conduct is itself an adverse employment action on which a claim for gender (sex) discrimination—as separate from a claim for sexual harassment/hostile work environment—can be made.

In her brief, Plaintiff relies on *Muldrow* in support of her argument. Plaintiff's citation to *Muldrow* in this regard misses the mark. In *Muldrow*, the Supreme Court considered what degree of *harm caused* by an employer's employment action is necessary to support a claim for employment discrimination. Put another way, the Supreme Court in *Muldrow* considered the standard that applies to the question of when an employer's employment action—in *Muldrow*, the employer's decision to transfer the plaintiff to another unit within the police department—is sufficiently adverse or harmful to an employee to support a discrimination claim. That case does not involve the question here, i.e., what constitutes an employment action on which a discrimination claim can be asserted? Ultimately, in *Muldrow*, the Supreme Court concluded (resolving a circuit split) that an employer's employment action is adequately adverse and actionable under Title VII when it "br[ings] about some disadvantageous change in an employment term or condition." 601 U.S. at 354. *Muldrow* does not support Plaintiff's argument that the fact of Reyes' sexual harassment is itself an actionable employment action sufficient to support a claim for gender (sex) discrimination.[5]

Second, the Court considers Plaintiff's argument that she can pursue a gender (sex) discrimination claim based on a theory of constructive discharge. As New Prime asserts—and

---

[5] Even if the interruption in Plaintiff's training and ensuring Plaintiff be physically removed from an alleged perpetrator of sexual harassment could be construed as an employment action akin to the transfer to a different unit as in *Muldrow*, the Court is skeptical that any such action could be found to have negatively impacted any term or condition of Plaintiff's employment with New Prime sufficient to withstand summary judgment.

9

notably Plaintiff does not present any argument to the contrary—Plaintiff did not plead constructive discharge in this case. Plaintiff's Third-Amended Complaint alleges, in fact, that "[a]t all relevant times, Plaintiff was a driver employed by [New] Prime." (Doc. 70-1 at 5, ¶ 19.) Plaintiff alleges no facts in the complaint that she resigned or left her employment or the training program with New Prime. Summary judgment in favor of New Prime as to a possible theory of constructive discharge is appropriate on this basis alone. Nonetheless, even if she had pleaded constructive discharge, as a matter of law Plaintiff cannot prove constructive discharge on this summary judgment record.

Courts recognize that an employee's constructive discharge is an actionable adverse employment action to sustain a claim for gender (sex) discrimination. *See, e.g., Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010). To prove constructive discharge, Plaintiff must show two things: "(1) a reasonable person in her situation would find the working conditions intolerable, and (2) the employer intended to force her to quit." *Id.* (cleaned up). Put another way, "[a]n employee has been constructively discharged when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate [her] employment." *Turner v. Honewell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 724 (8th Cir. 2003). As a matter of law, however, an employee is not constructively discharged if she does not "give[] the employer a reasonable opportunity to correct the intolerable condition before the employee quits." *Lisdahl v. Mayo Found.*, 633 F.3d 712, 719 (8th Cir. 2011); *see Lopez v. Whirlpool Corp.*, 989 F.3d 656, 664 (8th Cir. 2021) (no constructive discharge where employee "resigned four business days after telling HR about the problem" and therefore "fails to show that she gave Whirlpool a reasonable chance to address the issues"); *Watson v. Heartland Health Laboratories, Inc.*, 790 F.3d 856, 863-64 (8th Cir. 2015) (no constructive discharge in context of MHRA claim on similar grounds).

Here, it is undisputed on the summary judgment record that Plaintiff promptly (1) ended her training with New Prime after the Massachusetts day trip, (2) requested that her training contract be voided, and (3) never returned to New Prime. Plaintiff testified that she made the decision not to return to New Prime right after the incident had occurred with Reyes. As a matter of law, therefore, even if she had properly pleaded it in this case, Plaintiff cannot prove constructive discharge.

In short, the summary judgment record shows that New Prime is entitled to judgment as a matter of law as to Counts 1 and 3 asserting claims for gender (sex) discrimination because Plaintiff has not demonstrated any actionable discriminatory employment action by New Prime against Plaintiff. Reyes' sexual harassment of Plaintiff is not itself an employment action to support a separate claim for gender (sex) discrimination and Plaintiff cannot demonstrate constructive discharge as a matter of law. Any possible employment claim arising from Reyes' sexual harassment is more properly brought and analyzed under the well-established framework of a sexual harassment/hostile work environment claim rather than a gender (sex) discrimination claim.

New Prime's motion for summary judgment is therefore **GRANTED** as to Plaintiff's claims for gender (sex) discrimination asserted in Counts 1 and 3.

II. **Sexual Harassment/Hostile Work Environment (Counts 2 and 4)**

In Counts 2 and 4, Plaintiff asserts a claim against New Prime for sexual harassment/hostile work environment under both federal and state law.

As an initial matter, the parties dispute whether Reyes should be considered Plaintiffs' supervisor or co-worker for purposes of establishing New Prime's liability as an employer. The Court need not decide whether Reyes is a supervisor or co-employee for purposes of considering New Prime's liability, however, because in either case, the Court finds that New Prime cannot be held liable as a matter of law.

First, to the extent that Reyes is a co-worker and not a supervisor, New Prime can only be held liable for sexual harassment/hostile work environment if New Prime "knew or should have known of the harassment and failed to take prompt and effective remedial action." *Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 696 (8th Cir. 2021). In other words, when a plaintiff is harassed by a co-employee, "the employer is liable only if the employer's own negligence caused the harassment, or led to the continuation of the hostile work environment." *Id.* (citations omitted); *see Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010) ("If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for harassment.").

Second, to the extent Reyes is a supervisor, New Prime may be held strictly liable if a tangible employment action was taken against Plaintiff. *See McCurdy v. Ark. State Police*, 375 F.3d 762, 770 (8th Cir. 2004). If no tangible employment action is taken against Plaintiff, however, New Prime may be entitled to the *Ellerth-Faragher* affirmative defense for liability, so long as

11

(1) New Prime "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) Plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *McCurdy v. Ark. State Police*, 375 F.3d 762, 770 (8th Cir. 2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (8th Cir. 1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). The first element of the *Ellerth-Faragher* affirmative defense "imposes two requirements on employers," that is "they must have (1) exercised reasonable care to prevent sexual harassment (the 'prevention prong') and (2) promptly corrected any sexual harassment that did occur (the 'correction prong')." *Weger v. City of Ladue*, 500 F.3d 710, 719 (8th Cir. 2007) (citations omitted).

Before proceeding further, the Court must decide whether New Prime is entitled to pursue the *Ellerth-Faragher* affirmative defense. Whether New Prime may pursue the *Ellerth-Faragher* affirmative defense to liability depends on whether any tangible employment action was taken against Plaintiff. *See McCurdy*, 375 F.3d at 770 (*Ellerth-Faragher* affirmative defense to employer liability under Title VII based on actions by supervisor is available only "[w]hen no tangible employment action is taken" against the plaintiff in relation to the alleged harassment). In this regard, Plaintiff argues that Reyes' "harassment caused a tangible employment action" to the extent she was "taken off Mr. Reyes' truck," and therefore suffered economic harm and the interruption of her training at New Prime. Like her argument above relating to an actionable adverse employment action for her claim of gender discrimination, the Court finds that this argument misses the mark for what is required to hold New Prime (as the employer of the supervisor) strictly liable and to avoid application of the *Ellerth-Faragher* affirmative defense to employer liability: that is, that she suffered a tangible employment action.

"A tangible employment action constitutes a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or [an employment] decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. *See Bracely-Mosley v. Hunger Eng'g Co.*, 662 S.W.3d 806, 816 (Mo. Ct. App. 2023) (recognizing that "[a] tangible employment action is a significant change in employment status," such as "hiring and firing; promotion and failure to promote; demotion; undesirable reassignment; a decision causing a significant change in benefits; compensation decisions; and work assignments") (citations omitted). Plaintiff points to no similar action by New Prime (or New Prime through Reyes) akin to hiring, firing, demoting, transferring, etc. Relying merely on the *effect* of the harassment itself

12

(i.e., the interruption to her training to the extent she did not travel back with Reyes on the second half of the day trip because he sexually harassed her) or even Reyes' decision to sexually harass her itself, is not a sufficient to demonstrate a tangible employment action. Plaintiff points to no caselaw or legal authority in this regard; and to find otherwise would turn the purpose and legal framework of employer liability under Title VII/MHRA on its head.[6] Accordingly, since the record in this case is devoid of any tangible employment action taken against Plaintiff by Reyes or New Prime, the Court proceeds to consider whether New Prime is shielded from employer liability under the *Ellerth-Faragher* affirmative defense.

In this case, the undisputed facts show that when Plaintiff complained about Reyes' harassment to Kasterke, Reyes was contacted and told to stay away from Plaintiff, the Director of Corporate Security and Driver Liaison became involved, and Plaintiff was provided accommodations for lodging and transportation to get home by the next day. Moreover, within a week, New Prime promptly began an investigation of Plaintiff's complaint of sexual harassment against Reyes, which ended in Reyes' termination within approximately seven days after Plaintiff had made her complaint.

It is similarly undisputed that Plaintiff and Reyes were aware of and had received training concerning New Prime's anti-sexual harassment and nondiscrimination policies. Plaintiff does not argue that New Prime's response to her complaint of sexual harassment by Reyes was in any way deficient whether under New Prime's policies or otherwise. Instead, Plaintiff argues only that New Prime's policies and procedures "were deficient and ineffective at preventing harassing behavior at trainees" for a few reasons, none of which raise a triable issue of fact in this case for a jury.

Initially, the Court recognizes that "distribution of a valid antiharassment policy provides compelling proof that an employer exercised reasonable care to prevent and correct promptly harassing behavior." *Crawford v. BNSF Ry. Co.*, 665 F.3d 978, 983 (8th Cir. 2012). Plaintiff argues that New Prime's policies are deficient, though, because the policies "allowed people with a sexual

---

[6] Additionally, the Court notes that although Plaintiff argues elsewhere that she has a claim for constructive discharge (which has been recognized as a tangible employment action in the context of considering the *Ellerth-Faragher* affirmative defense), Plaintiff does not assert constructive discharge for these purposes. And even if she had, for the reasons explained above, the Court would find that Plaintiff was not constructively discharged as a matter of law.

harassment history to become trainers." There is no evidence in this summary judgment record that there were any driver trainers who had a "sexual harassment history," however.

To the extent Plaintiff is obliquely referring to Reyes, at most, Plaintiff points to the deposition testimony of another female trainee of Reyes' (Mushlit) indicating that before the incident between Reyes and Plaintiff had occurred, she had previously reported the "negative experiences" she had had with Reyes to her boyfriend (a driver at New Prime) and an individual whom at the time she had "planned to be [her] [over-the-road] trainer." Even if Mushlit were considered to have properly reported Reyes' conduct under New Prime's anti-harassment policy,[7] "a single failure by [New Prime] to implement its anti-harassment policy would not be sufficient to conclude that it had not effectively implemented its policy where there was other evidence that it enforced its policy." *Crawford*, 665 F.3d at 984. Here, "[o]f special significance was [New Prime]'s extremely swift action in investigating and terminating [Reyes] once [Plaintiff] finally reported [Reyes]'s behavior." *Id.* Moreover, it is undisputed that no trainee (including Mushlit) ever stated on an evaluation that Reyes had subjected them to sexual harassment. At most, Mushlit answered "yes" on her evaluation form of Reyes that he had "act[ed] unprofessional in any manner" but did not provide any further comment or details that he had acted unprofessionally, much less that he had done so in a sexual-harassment way.

Plaintiff also argues that New Prime's policies and procedures are deficient and there is at least a genuine question of material fact whether New Prime acted reasonably to prevent harassment because driver trainer evaluations were not required, and New Prime did not follow up when a trainee indicated that a driver trainer had acted "unprofessionally." Whether the evaluation forms were mandatory or whether New Prime followed up when a trainee indicated a driver trainer had acted "unprofessionally" (without any indication that the trainer had engaged in sexually harassing behavior) does not raise a genuine question of fact in this regard to the extent New Prime has a facially valid anti-harassment policy that, when invoked "brought an immediate end to [Reyes]'s harassment." *Weger*, 500 F.3d at 720.

As to the second element of the *Ellerth-Faragher* affirmative defense, New Prime points to *McCurdy*, in which the Eighth Circuit recognized a "modified" *Ellerth-Faragher* affirmative

---

[7] New Prime's anti-harassment policy sets forth the following complaint procedure: "If you experience any job-related harassment . . . promptly report the incident to your Fleet Manager, Operations Managers, Security Department or the Legal Department. If you are attending new training classes, report the incident to the training staff and/or your recruiter." (Doc. 84-17.)

14

defense applicable to cases involving single incidents of supervisor sexual harassment. Under the modified *Ellerth-Faragher* affirmative defense recognized by the Eighth Circuit, an employer is not held liable whether or not they can satisfy the second element of the *Ellerth-Faragher* affirmative defense to the extent the employer "ha[s] effective anti-harassment policies and take[s] swift remedial measures when put on notice of harassing conduct." 375 F.3d at 772 & 774 n.10. In other words, in the context of a single incident of supervisor sexual harassment, an employer may be held liable if it "negligently allows the harassment to continue, the supervisor uses apparent authority to harass an employee, or the supervisor is aided in the harassment by the agency relation." *Id.* at 774 n.10. To be sure, as the Eighth Circuit clarified in *McCurdy*: "[I]n single incident cases in which the employee takes advantage of preventative or corrective opportunities provided by the employer and the employer thereafter takes swift and effective action to avoid further offensive conduct," an employer is not held liable for sexual harassment/hostile work environment as a matter of law. *See id.* at 772. Here, it is undisputed (1) that Plaintiff immediately utilized New Prime's anti-sexual harassment policy and communicated the incident with Reyes to the appropriate parties at New Prime, and (2) that New Prime took swift and effective action which included an investigation that resulted in Reyes' termination within just seven days after Plaintiff had reported the harassment.

For all the reasons explained above, the Court finds as a matter of law that New Prime cannot be held liable for sexual harassment/hostile work environment alleged by Plaintiff here. New Prime's motion for summary judgment is therefore **GRANTED** as to Plaintiff's claims for sexual harassment/hostile work environment in Counts 2 and 4.

## Conclusion

New Prime's motion for summary judgment is therefore **GRANTED** and judgment is entered for Defendant on Plaintiff's claims for gender (sex) discrimination (Counts 1 and 3) and sexual harassment/hostile work environment (Counts 2 and 4).

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark  
ROSEANN A. KETCHMARK, JUDGE  
UNITED STATES DISTRICT COURT

DATED: February 5, 2025